# United States Court of Appeals
## For the First Circuit

No. 00-1317

UNITED STATES OF AMERICA,

Appellee,

v.

MARC A. ZACCARIA, A/K/A MATT SHAVONE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lipez, Circuit Judge.

Edward J. Romano, by appointment of the court, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, and Richard W. Rose, Assistant United States Attorney, were on brief, for appellee.

February 14, 2001

**SELYA, <u>Circuit Judge</u>.** This appeal requires us to determine, for the first time, the extent to which a prospective witness's silence after receiving <u>Miranda</u> warnings can be used as impeachment evidence. Finding no error in the district court's exclusion of this evidence or in either of the other rulings challenged on appeal, we affirm the judgment of conviction.

## I. BACKGROUND

The parties, ably represented, have provided us with an exegetic account of the events leading to the appellant's indictment. The issues before us, however, are context-specific. Thus, an apothegmatic summary suffices to place them into perspective. We add more details, as the occasion demands, in connection with our subsequent discussion of the points on appeal.

The evidence showed (or so the jury could have found) that defendant-appellant Marc A. Zaccaria contrived a scheme to counterfeit United States currency through the use of a state-of-the-art color copier. The phony bills were high-quality; they contained, inter alia, replicas of the Treasury Department's latest security strip and a protective coating designed to frustrate the most commonly used test for authenticity. The appellant moved the copying operation from

-3-

location to location, and dealt with several different individuals (many of them acquaintances from his days in the automobile business) in his endeavor to bring the scheme to a lucrative climax.

It is said that all good things come to an end. So it was here: the Secret Service eventually got wind of the appellant's nefarious activities. Its ensuing investigation was aided by a number of people who were involved with the appellant and/or the scheme in one way or another. Of this rather motley crew, two individuals (both of whom testified against the appellant at trial) are particularly important to the instant appeal.

The first, Joseph Morsilli, Sr., helped the appellant to start his "copy business." Morsilli insisted that he had relied on the appellant's representation that the proposed venture was entirely legitimate. The second witness, Ted Blume, was close to the appellant and to various other persons who testified for, or gave information to, the government. Among Blume's intimates were individuals who the appellant alleged were attempting to frame him.

We shall return to Morsilli and Blume shortly. For now, we note that, after a six-day trial, the jury found the appellant guilty of conspiracy to pass counterfeit monetary

instruments, sale of such instruments, and possession of a counterfeiting deterrent (the security strips). See 18 U.S.C. §§ 371, 472, 474A(b). The trial court imposed a forty-eight month incarcerative sentence, to be followed by a five-year supervised release term. This appeal ensued.

## II. DISCUSSION

On appeal, Zaccaria complains of three evidentiary rulings. He claims that each of these rulings was as bogus as the bills that the government offered in evidence at his trial. He also claims that each ruling constituted reversible error.

We apply a familiar standard of review. Every trial presents a blend of idiosyncratic circumstances, and presiding judges must be afforded some leeway in making evidentiary rulings. For the most part, therefore, a district court's rulings admitting or excluding evidence are evaluated for abuse of discretion. E.g., United States v. Winchenbach, 197 F.3d 548, 559 (1st Cir. 1999); Iacobucci v. Boulter, 193 F.3d 14, 20 (1st Cir. 1999). We use this benchmark in assaying the appellant's asseverational array.[1]

_____

[1]The government posits that the appropriate standard of review on some or all of these claims is plain error because the appellant's arguments were not properly preserved in the trial

-5-

## A.

We deal first with the implications of a witness's invocation of his right to remain silent. The background facts are these. In July 1996, Morsilli went to the Secret Service's Providence office to provide fingerprints and handwriting exemplars in compliance with a grand jury subpoena. While there, he apparently received <u>Miranda</u> warnings, <u>see</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436, 479 (1966), and thereafter eschewed any further discussion with federal agents.[2]

Morsilli testified for the prosecution at the appellant's trial, portraying himself as an innocent dupe. During cross-examination, the appellant sought to discredit this testimony by showing that Morsilli had declined to speak with the agents after having been advised of his constitutional rights. The district court sustained the government's objection

_____

court. In this case, however, a more stringent standard of review would not affect our ultimate conclusion. Thus, we assume, favorably to the appellant, that all the issues raised on appeal were duly preserved.

[2]We say "apparently" because the appellant's claim to that effect hinges on a somewhat cryptic note in the agency's case file. The note, purportedly written by an unidentified Secret Service agent, was vague as to what rights were invoked, when those rights were cited, and whether the note pertained to Morsilli, or to his son (who also was summoned to the office because of his suspected involvement with the appellant), or to both.

-6-

to this line of questioning.  Zaccaria assigns error to this ruling.

In the appellant's view, Morsilli's invocation of his right to remain silent during the interview with the Secret Service implies guilt — specifically, his participation in the counterfeiting scheme — thus contradicting his trial testimony and providing fertile ground for impeachment.  This argument for the use of silence to impeach has a patina of plausibility, but it does not withstand close scrutiny.

We begin our analysis by emphasizing that the issue before us is evidentiary, not constitutional.  The law is now firmly settled that an accused's invocation of the right to remain silent is constitutionally protected and ordinarily cannot be used against him for impeachment or otherwise as evidence of guilt.  Doyle v. Ohio, 426 U.S. 610, 617-19 (1976); United States v. Daoud, 741 F.2d 478, 480 (1st Cir. 1984).  The appellant, however, does not seek to impinge upon this constitutional bulwark. He points out, correctly, that Morsilli appeared as a witness, not as a defendant, and argues that the Constitution therefore interposes no impediment to the proposed line of cross-examination.  This is a meaningful distinction and, to its credit, the government concedes the point.

There is, however, an evidentiary dimension (in addition to a constitutional dimension) to an invocation of the right to remain silent. The Supreme Court dealt with this evidentiary dimension in United States v. Hale, 422 U.S. 171 (1975). That case involved an inquiry into a criminal defendant's silence at the time of questioning — but the case was decided the year before the Doyle Court extended constitutional protection to a defendant's decision to remain silent after receiving advice about his rights. Because the Court treated the question as a matter of evidence, as must we, Hale affords relevant guidance.

The Hale Court noted that the admissibility of this sort of disputed evidence necessarily hinges on the validity of the premise that silence in the face of questioning is inconsistent with — and thus impeaches — a later claim of innocence. Id. at 176. The Court remarked the dubiousness of that premise, stating that "[i]n most circumstances silence is so ambiguous that it is of little probative force." Id. The Court proceeded to mine the record in search of special circumstances that might have rendered Hale's silence inconsistent with a subsequent claim of innocence, and found none. Id. at 177-80. As a result, the Court concluded that

-8-

Hale's invocation of the right to remain silent had virtually no probative value as an inconsistent statement. Id. at 180.

The Hale Court then turned to the other pan of the scales. Balancing against the lack of probativeness, the Court found a substantial likelihood of unfair prejudice should the showing of silence be allowed. "The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted." Id. The resulting combination — scant probative value and a significant risk of unfair prejudice — proved deadly: the Court concluded that information about Hale's invocation of his right to remain silent should not have been allowed into evidence as a means of impeachment. Id. at 180-81.

The same analytic framework pertains here.[3] The admissibility vel non of evidence anent Morsilli's silence depends on constructing a balance involving the probative worth of the evidence and its unfairly prejudicial effect. See Fed. R. Evid. 403. Hale teaches that the trial court must start this task from a binary premise: (1) that silence per se generally

---

[3]There are, of course, potential differences in the evidentiary considerations that pertain to a criminal defendant, on the one hand, and an ordinary witness for the government, on the other hand. While these differences might be important in some circumstances, this case, on the whole, seems a fair congener to Hale.

has little or no probative value for impeachment purposes, 422 U.S. at 176; and (2) that evidence of the invocation of the right to remain silent is inherently prejudicial, id. at 180. Thus, a proffer of such evidence should be rejected unless special circumstances exist in a given case that materially shift the balance in favor of admissibility.

In this instance, the district court understood its role and methodically constructed the appropriate balance. Surveying the record, it found no extraordinary circumstances and, hence, no basis for making an exception to the usual rule. We agree with this determination. On the facts of this case, as in Hale, 422 U.S. at 176-80, Morsilli's silence was completely ambiguous. The appellant does not identify, nor can we discern, any special trappings that might imbue Morsilli's silence with unaccustomed probative force.[4] Moreover, the appellant does not seriously dispute that the proffered evidence was freighted with potential prejudice; there was, after all, a real danger that the jury would read considerably more into the witness's close-mouthedness than reason might warrant.

---

[4]In this respect, the case at hand is unlike United States v. Goldman, 563 F.2d 501 (1st Cir. 1977). There, we found Hale not controlling because the defendant had waived his right to silence and, later, failed to answer questions. Id. at 504. In that context, the defendant's refusal had appreciable probative value. Id.

-10-

That ends this aspect of the appeal. With Morsilli's silence not significantly probative, the likelihood of unfair prejudice looming large, and a record devoid of special circumstances, the lower court plainly did not misuse its discretion in excluding the proposed line of questioning. See Hale, 422 U.S. at 176-81; cf. Grunewald v. United States, 353 U.S. 391, 423-24 (1957) (holding, on evidentiary grounds, that inquiries regarding an accused's invocation of his privilege against self-incrimination when testifying before a grand jury should not have been admitted for impeachment purposes).

**B.**

We proceed to the appellant's next ground for appeal. During the trial, his counsel sought to question the lead Secret Service agent, Peimer, concerning the administration of (or failure to administer) polygraph tests to certain potential witnesses. In launching this initiative, counsel forswore any interest in the test results or in the techniques employed in administering the tests. Instead, he explained that he wanted to pursue whether polygraphs were used as a tool in the course of this investigation, to whom they were offered, which witnesses agreed to take them, and which did not. Zaccaria's appellate counsel channels this offer of proof, suggesting that this line of inquiry was designed to probe "whether the

-11-

government agents may have ignored their own investigation methods to protect their witnesses, or whether the government felt that the witnesses were being evasive." Appellant's Brief at 23.

The district court found the proposed inquiry wholly irrelevant, potentially confusing, and unfairly prejudicial. Consequently, it sustained the government's objection. Having considered both the ruling and the appellant's claim of error, we conclude that the court properly pretermitted the anticipated line of questioning.

We begin with bedrock. The right to cross-examine adverse witnesses in criminal cases is constitutionally protected, and courts historically have given criminal defendants considerable latitude in pursuing that right. Nevertheless, cross-examination is not a freestyle exercise, but, rather, must be conducted within reasonable limits. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); United States v. Chaudhry, 850 F.2d 851, 856 (1st Cir. 1988). Suitable boundaries can and should be set by the trial judge. As we wrote on an earlier occasion:

> Defendants cannot run roughshod, doing
> precisely as they please simply because
> cross-examination is underway. So long as a
> reasonably complete picture of the witness'
> veracity, bias, and motivation is developed,
> the judge enjoys power and discretion to set

-12-

> appropriate boundaries. Indeed, the judge
> has a responsibility to do so.

United States v. Boylan, 898 F.2d 230, 254 (1st Cir. 1990) (citations omitted). We follow the Boylan approach here, mindful that the lower court, on the whole, treated the appellant's wide-ranging cross-examination of Peimer and other government witnesses very hospitably.

One border that constrains cross-examination involves the question of whether a particular piece of proof is too remote or peripheral, vis-à-vis the issues in the case, to be admitted into evidence. By and large, the responsibility for patrolling that border reposes with, and is subject to the sound discretion of, the trial judge. See Averitt v. Southland Motor Inn, 720 F.2d 1178, 1182 (10th Cir. 1983); Hill v. Rolleri, 615 F.2d 886, 891 (9th Cir. 1980). The "polygraph" questioning is of that genre: its relevance to the appellant's guilt or innocence is so tenuous as to place it at the margins of allowable cross-examination (and, therefore, within the discretion of the presider to admit or exclude).

The appellant claims that the appearance of remoteness is deceiving. He argues poignantly that the proposed interrogation was designed to show that the government was somehow playing fast and loose (say, by unfairly protecting its witnesses, currying favor with them, or tolerating their

evasiveness). But that surmise requires much too attenuated a chain of inference. For example, the fact that polygraph tests ultimately were not administered could be attributable to any number of reasons (e.g., administrative oversight, lack of time, lack of resources, the personal proclivities of a specific agent, knowledge that the test results would be inadmissible at trial, and so on and so forth). Many (perhaps most) of these possible reasons have no bearing either on the government's bona fides or on the issues in this case. In the absence of a particularized showing that the government was not turning square corners, the district court acted well within its discretion in refusing to let defense counsel embark on a fishing expedition. See Bui v. DiPaolo, 170 F.3d 232, 244 (1st Cir. 1999).

The lower court's exclusionary ruling is made all the more invulnerable by the subject matter of the proposed inquiry. Testimony about the government's non-administration of polygraph examinations would be apt to spark an unwarranted — and profoundly prejudicial — inference that the Secret Service agents believed the test results would be harmful to their cause. Cf. Wolfel v. Holbrook, 823 F.2d 970, 974-75 (6th Cir. 1987) (excluding evidence of an individual's refusal to volunteer for polygraph testing because such evidence would be

-14-

"likely to create a highly prejudicial inference that the results of the test would have been unfavorable"). The substantial likelihood of unfair prejudice associated with this line of questioning, combined with the speculative nature of the appellant's bias theory, convinces us that foreclosing the inquiry entailed no abuse of discretion. See Williams v. Drake, 146 F.3d 44, 47 (1st Cir. 1998) ("Trial courts have significant leeway in determining whether to admit or exclude evidence under the aegis of Rule 403.").

## C.

The appellant's last sortie involves a question on cross-examination concerning whether a government witness, Blume, had ever sold drugs with Adamo (another government witness). Blume replied in the negative, but the prosecutor nonetheless objected. The district court sustained the objection. The appellant assigns error. We discern none.

As previously noted, cross-examiners cannot be permitted to rove at will. One salubrious limitation that courts have developed holds that a party who seeks to cross-examine a witness for the purpose of impeaching his credibility cannot base his queries solely on hunch or innuendo. See Bui, 170 F.3d at 243-44; United States v. Carty, 993 F.2d 1005, 1010

(1st Cir. 1993). The appellant's attempt to cross-examine Blume about his supposed drug dealing transgressed this principle because the questioning lacked a satisfactory evidentiary foundation. We explain briefly.

When the government objected to the appellant's question, Judge Lisi asked defense counsel to identify a factual basis for it. All that counsel had to offer was an unsubstantiated claim that the appellant (who did not plan to testify or submit an affidavit) had told him that Blume had admitted participating in drug trafficking activities with Adamo. Judge Lisi was understandably skeptical. She demanded some sort of evidentiary corroboration, stating that "I'm going to want to see something from your client. Until then, the objection is sustained." The appellant made no further proffer.

The stated basis for the question — counsel's secondhand assertion that Blume had made an admission to Zaccaria — was too porous to support the weight of so charged a line of cross-examination. As a fundamental proposition, some proof in the form of concrete facts must underlie any offering that can be accepted by a trial court as evidence. Cf. 1 John Henry Wigmore, Wigmore on Evidence § 1 (Peter Tillers ed., 1983) (noting that "[e]vidence . . . is any matter of fact that is furnished to a legal tribunal otherwise than by reasoning or a

reference to what is noticed without proof").  There is little law on the exact dimensions of what constitutes a satisfactory evidentiary foundation in any given instance.  Thus, the answer tends to be case-specific.[5]

While this standard is difficult to articulate and apply in close cases, it is self-executing at the margins.  This is such a situation.  The appellant offered no evidence whatever that Blume had ever dealt drugs (with Adamo or anyone else).  This, then, is the paradigmatic example of which Professor Wigmore warns:  that on cross-examination "facts of discreditable conduct [may be] groundlessly asked about in the hope that though denied they will be assumed by the jury to be well founded."  1 Wigmore, supra, § 17.  In such circumstances, a firm judicial hand is the best safeguard of the fairness of the trial process.

---

[5]Our ruling in Bui is instructive.  There, the petitioner claimed that he was being framed by a drug lord.  170 F.3d at 243.  To develop this theory, he sought to cross-examine a government witness as to whether the witness knew that he (the petitioner) had declined to transport contraband for the drug lord.  Id.  This, the petitioner hoped, would lead the jury to conclude that the rebuffed drug lord framed him as retribution for his lack of cooperation.  Id.  We found the petitioner's proffer in support of this proposed line of cross-examination unacceptable because "to that point in the trial, there had been no evidence even remotely supporting the petitioner's offer of proof."  Id.  Given such an "exiguous record," the petitioner could not rewardingly cite himself as the source of the foundational facts — at least in the absence of sworn testimony or an affidavit.  Id. at 243-44.

-17-

To say more on this point would serve no useful purpose. Given the complete lack of undergirding factual support for the appellant's question, it cannot reasonably be said that the trial judge abused her discretion in refusing to allow further inquiry into the matter of drug trafficking. See Bui, 170 F.3d at 243-44; Carty, 993 F.2d at 1010.

In all events, there is another, independently sufficient reason for rejecting this assignment of error: Blume answered the question and the district court did not strike his negative response. His denial was, therefore, before the jury. E.g., United States v. Polito, 856 F.2d 414, 419-20 (1st Cir. 1988) (holding that testimony not stricken from the record may be regarded by the jury as evidence, notwithstanding parties' mutual, but mistaken, assumption that the court had stricken it); Tanner v. United States, 401 F.2d 281, 290-92 (8th Cir. 1968) (explaining, in analogous circumstances, that testimony not stricken "remained before the jury for [its] consideration" despite the sustaining of the opponent's objection). In light of Blume's disclaimer, nothing would have been gained from further questioning. See Fed. R. Evid. 608(b) (barring the introduction of extrinsic evidence for impeachment on collateral matters). Thus, even if the district court had erred in

sustaining the objection — and we do not believe that it did — the error would have been harmless.

## III.  CONCLUSION

We need go no further.  The appellant has failed to show that the district court abused its discretion in the exclusion of evidence.  For aught that appears, the appellant was fairly tried.  In other words, his conviction is authentic, not counterfeit.


**Affirmed.**