# United States Court of Appeals
## For the First Circuit

No. 07-1854

UNITED STATES OF AMERICA,

Appellee,

v.

EDDIE S. RODRÍGUEZ-BERRÍOS,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lipez, and Howard, Circuit Judges.

G. Richard Strafer for appellant.
Vijay Shanker, Attorney, United States Department of Justice,
with whom Rosa Emilia Rodriguez-Velez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, were on brief,
for appellee.

July 23, 2009

**LIPEZ**, <u>Circuit Judge</u>.  After a jury trial, appellant Eddie Samir Rodríguez-Berríos was found guilty of committing a carjacking that resulted in the death of his ex-wife.  He now challenges that conviction, arguing that the evidence against him was insufficient to support the jury's verdict that he had the requisite intent to commit a carjacking.  He also claims that the trial judge made several erroneous evidentiary rulings, erred in excluding the testimony of a proffered expert witness on the flaws in eyewitness identification, and erred in denying his motion for a mistrial after a government agent referred in his testimony to a polygraph examination that appellant had been summoned to take.  For the reasons set forth below, we affirm the conviction.

## I.

Appellant was a police officer for the Commonwealth of Puerto Rico in Guayama.  In 1995, he married the victim, Yesenia Ortiz-Acosta ("Ortiz").  They had one daughter together and were then divorced in February 1999.  Ortiz disappeared approximately two months later, on April 15th, 1999, while driving her car in Guayama.  About two weeks after her disappearance, her burned-out car was found in an area where smoke had been seen on the night she had disappeared.  The car had been intentionally burned with an accelerant, such as gasoline, and the victim's body was never found.  Appellant quickly became a suspect in the investigation of

his ex-wife's disappearance. During the following month, he made several incriminating admissions linking him to her murder.

On April 14, 2004, a grand jury indicted appellant and two co-defendants for conspiracy to commit a carjacking (count one), carjacking resulting in death (count two), and using fire to commit the felonies of conspiracy and carjacking (count three). The government later dismissed all charges against the two co-defendants and counts one and three against appellant. Appellant then faced one charge for committing a carjacking resulting in death, in violation of 18 U.S.C. § 2119(3).

The jury trial began on September 7, 2006. During its case-in-chief, the government sought to describe a pattern of abuse and stalking of the victim by appellant in the months leading up to the victim's disappearance. Often over appellant's objections, several prosecution witnesses recounted their own observations of his abuse, stalking, and threats as well as statements made by the victim describing the same.

In his defense, appellant presented alibi witnesses, including his brother, who claimed that he spent the early evening of April 15th fishing with appellant. Appellant's ex-girlfriend then testified that she went to get ice cream with him when he returned from fishing. Appellant also testified, denying involvement in the victim's death and denying making the

incriminating statements. He also denied several of the incidents of abuse and stalking described by prosecution witnesses.

At the close of evidence, appellant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court denied the motion. On September 13, 2006, the jury found appellant guilty of carjacking resulting in death. The district court sentenced him to life imprisonment followed by five years of supervised release.[1] This appeal followed.

## II.

Although appellant challenges the sufficiency of the evidence supporting the intent element of the carjacking conviction, he also claims that the district court erred in the admission of certain evidence. Because our resolution of those evidentiary challenges affects the body of evidence we may consider in assessing the sufficiency of the evidence, we will assess the evidentiary challenges first. See United States v. Avilés-Colón, 536 F.3d 1, 13 (1st Cir. 2008). We review a trial court's decision

---

[1] Although appellant's life sentence means that he will never serve the term of supervised release, the Sentencing Guidelines instruct courts to impose a term of supervised release whenever imposing a sentence of imprisonment of one year or more. U.S.S.G. § 5D1.1. For Class A felonies, the sentence should be least three years but not more than five years. U.S.S.G. § 5D1.2. Terms of supervised release following life sentences are, therefore, not uncommon. See, e.g., United States v. Mitchell, No. 08-10027, 2009 WL 1758746 at *1 (9th Cir. June 23, 2009); United States v. Reyes-Echevarria, 345 F.3d 1, 2 (1st Cir. 2003); United States v. Nelson-Rodriguez, 319 F.3d 12, 27 (1st Cir. 2003).

to admit or exclude evidence for abuse of discretion.  <u>United States</u> v. <u>Gilbert</u>, 181 F.3d 152, 160 (1st Cir. 1999).

## A. Hearsay Challenges

### 1. The Statements

Appellant contends that Rosa Ramos-Rodríguez ("Ramos"), a coworker and friend of the victim, was improperly allowed to testify about hearsay statements made by the victim.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  Under the Federal Rules of Evidence, hearsay statements may not be admitted unless they fall within an exception or exclusion to the hearsay rules. Fed. R. Evid. 802.

Appellant challenges Ramos's testimony that the victim told her that bruises on her arm were caused by appellant and that "she was afraid, afraid of him," and that she observed appellant pass the victim in a hallway and nudge her with his elbow, a seemingly minor incident that nonetheless caused the victim to become upset and to "los[e] control."  Over defendant's hearsay objections, the court ruled that this evidence was admissible under Rule 803(2), which excepts excited utterances, or Rule 803(3), which excepts statements about "then existing mental, emotional, or physical condition[s]" (also known as the state of mind exception).

The government correctly concedes that the victim's statements to Ramos about past abuse by appellant were neither excited utterances nor admissible expressions of the victim's state of mind. Excited utterances are statements related to a startling event made while the declarant is "under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). There is no evidence of a startling event occurring anytime near the victim's identification of her bruises or her statement that she feared appellant. We also agree that the statement identifying the cause of the victim's bruises was not admissible as a statement of "then existing mental, emotional, or physical condition," Fed. R. Evid. 803(3). As for her statement that she was afraid of appellant, while it did describe an emotional condition, the government acknowledges that Ortiz's state of mind was not relevant to any issue in this case.[2]

The defendant also attacks statements recounted by the victim's mother, Maria Cristina Acosta-Sanchez. In particular, appellant claims that the district court erred by admitting Acosta's testimony that, after being "confronted with her adultery,"[3] the victim accused appellant of following her

_____

[2] However, appellant is mistaken that Ramos's testimony that the victim lost control and started crying after appellant elbowed her in the hallway was a hearsay statement. There is no statement involved in this testimony.

[3] We note that appellant's brief, in making this argument, mischaracterizes Acosta's testimony. Acosta did not say that the

everywhere and said that she could not "have lunch in peace" because of his stalking. Appellant also claims that Acosta was erroneously allowed to testify that the victim called the defendant "an abuser" and said that he "would drop the baby at her from far away, that she was afraid the baby might drop." The government concedes that these hearsay statements were not admissible under the state of mind or excited utterance exceptions. We agree.[4]

## 2. The Protective Order

Appellant also challenges the district court's admission of evidence that the victim obtained a protective order against him in February 1999. He argues that the admission of evidence of the

_____

victim made these accusations after being "confronted with her adultery." Rather, Acosta said that the victim made the allegations after being told that the defendant had surreptitiously recorded her in her car.

[4] Appellant also challenges the admission of the hearsay statements on the ground that their admission violated his rights under the Sixth Amendment's Confrontation Clause. Appellant concedes that the hearsay statements admitted through the testimony of Ramos and Acosta were not "testimonial" for purposes of the Confrontation Clause analysis set forth by the Supreme Court in Crawford v. Washington, 541 U.S. 36, 68 (2004). Nonetheless, he argues that we should apply the older rule of Ohio v. Roberts, 448 U.S. 56 (1980), to the non-testimonial hearsay and find it to be in violation of the Confrontation Clause because it was not introduced through a "firmly rooted" hearsay exception and did not bear "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. at 66 . However, post-Crawford, the Supreme Court held in Davis v. Washington, 547 U.S. 813, 823-24 (2004), "that the Confrontation Clause applies only to testimonial hearsay." United States v. Earle, 488 F.3d 537, 542 (1st Cir. 2007). We therefore reject appellant's argument that the non-testimonial hearsay admitted through Acosta and Ramos violated his rights under the Confrontation Clause.

-7-

protective order constructively amounted to admission of indirect testimonial hearsay in the form of the statements of the victim required to obtain the protective order, even though no such underlying statements were actually admitted into evidence. As such, according to appellant, the evidence about the protective order violated his rights under the Confrontation Clause.

We do not reach the merits of appellant's novel hearsay argument because we find that appellant has waived the right to make this argument on appeal. United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) ("A party waives a right when he intentionally relinquishes or abandons it . . . . [A] waived issue ordinarily cannot be resurrected on appeal."). Evidence about the existence of the protective order was first admitted during the direct examination of the victim's mother, Acosta, when the government inquired about the protective order. The defendant made no objection to her testimony about the order, which included the following interchange:

> Acosta: Yesenia said that she would obtain a court protective order. And I would tell her, no, not to do it, because I got scared, because -- I was scared, and I thought that would make him even angrier, and that he could hurt her or worse.
>
> Prosecutor: Do you know if Yesenia, in fact, requested a protective order?
>
> Acosta: Yes. She went and she filed it anyway.

> Prosecutor: After that day, what conversations, if any, did you have with the defendant concerning the protective order?
>
> Acosta: He went home and told me Yesenia had obtained a court protective order. And he told me he knew what he would do before they disarmed him.

During cross-examination of Acosta, appellant's counsel asked questions about the protective order.[5] Later, however, appellant objected when the government sought to enter the actual protective order into evidence or, alternatively, to have the court take judicial notice of the dates the order was issued and later dismissed at the victim's request. The government stated that the purpose of entering one of these two pieces of evidence was only "to establish the date it was filed and later retracted." Appellant then argued for the first time that "the order itself picks up on her statements. The statements are testimonial for Crawford purposes."

In response to appellant's objection, the court suggested taking judicial notice that, "She requested, and a Protective Order was issued February 4, and she requested that it be dropped, and it

---

[5] Counsel for appellant pursued a line of questioning about the timing of the protective order, suggesting that Ortiz had obtained the order only after her family learned that she was having an affair with another man. Appellant apparently sought to minimize the effect of the protective order by suggesting that the victim accused appellant of domestic violence and filed the protective order as a means to excuse her extra-marital affair. After a few questions on the matter, the district court sustained the government's objection to this line of questioning.

was dropped on the 9th."   The Court pointed out, accurately, that there was already evidence about the existence of a protective order in the record. The following interchange occurred:

> The Court: Counsel, you have all the testimony in the record; that he didn't know she had requested a Protective Order, and when he found out, he got all upset.  Come on, let's don't -- and there's testimony here that she requested the Protective Order.
>
> Counsel for Appellant: I know it is true.
>
> The Court: There's testimony here that she requested the Protective Order and that the father insisted, and she withdrew it after the father insisted.  What's all the fuss? I don't understand it.
>
> Counsel for Appellant: So what would the Court state to the jury?
>
> The Court: The Court will not state anything.[6] Do you have any objection that I take judicial notice of the Protective Order, which is what is before the Court?
>
> Counsel for Appellant: Judicial notice as to the dates only, not as to the contents.
>
> The Court: Of course
>
> Counsel for Appellant: Okay.
>
> [....]
>
> The Court: Do you have any objection that I take judicial notice of it?

---

[6]  "In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed."  Fed. R. Evid. 201(g).  It is therefore not clear why the judge stated that he would "not state anything" about the judicially-noticed fact to the jury.

-10-

Counsel: I don't, Your Honor.

The Court: Let's do it that way then.[7]

While appellant's initial failure to object to the introduction of testimony about the existence of a protective order may have led only to forfeiture of his objection, allowing us to review the challenge for plain error, Rodriguez, 311 F.3d at 437; United States v. Olano, 507 U.S. 725, 733 (1993), the subsequent compromise about judicial notice of the protective order indicates a conscious relinquishment of his objection that amounted to waiver of the right to object to the substance of the compromise. "A party who identifies an issue, and then explicitly withdraws it, has waived the issue." Rodriquez, 311 F.3d at 437. We therefore do not reach appellant's claims that the protective order relied on hearsay statements and that in so doing it violated his rights under the Confrontation Clause. The order may be considered as part of the body of evidence underlying appellant's conviction.

## B. Rule 404(b) Challenge

Appellant also argues that the district court committed error under Federal Rule of Evidence 404(b) in admitting evidence about his prior abuse and stalking of the victim. Appellant moved in limine for a determination of the admissibility of this evidence

---

[7] In the end, however, the judge's silence on the significance of judicial notice did not matter. The evidence of the dates of the protective order resulting from the court's "judicial notice" was never given to the jury.

before trial. Acknowledging the necessity of "balancing the prejudicial effect of the evidence against the probative value of the prior conduct or bad acts," the district court determined that it was better to reserve its ruling on the motion, declaring that "[t]he Court will consider Rodríguez-Berríos'[s] objections to the government's 404(b) evidence if and when they arise during trial." As it turned out, that opportunity never arose because appellant never again raised his objections. We therefore review his claims for plain error.

The Federal Rules of Evidence prohibit the introduction of evidence of a person's prior acts "in order to show action in conformity therewith." Fed. R. Evid. 404(b). Therefore, evidence of prior acts may not be used for the sole purpose of proving that a defendant had a propensity to commit a crime. United States v. Jimenez, 507 F.3d 13, 17 (1st Cir. 2007). Such "prior act" evidence is admissible, however, for other relevant purposes, such as to prove motive, intent, preparation, or plan. Fed. R. Evid. 404(b).

We have previously adopted a two-part test for evaluating the admissibility of evidence challenged under Rule 404(b). See United States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995). First, a court must determine whether the proffered evidence has "special relevance" -- in other words, whether it is relevant to any purpose other than to prove that a defendant has a

propensity to commit a crime. Id. If the court finds a special relevance for the evidence, it must then evaluate it under Federal Rule of Evidence 403 to determine whether the probative value of the evidence is substantially outweighed by its danger of unfair prejudice. Id.

We first note that appellant's brief does not make clear which items of evidence he claims were erroneously admitted in violation of Rule 404(b). Nonetheless, even giving him the benefit of the doubt by assuming that he objects on Rule 404(b) grounds to all of the evidence of his stalking and abuse of the victim, we find no plain error. In pretrial motions, the government set forth how it planned to use the evidence. Citing supporting case law from other circuits, it claimed that the evidence was not excluded by Rule 404(b) because it was "inextricably intertwined" with the crime charged and was necessary to provide coherence to its case. That rationale was apt.

As we note in our sufficiency of the evidence discussion, see infra part III, the government has the particular burden in carjacking cases to prove that a defendant acted with intent to cause death or serious bodily harm to the victim at the moment of the carjacking. See 18 U.S.C. § 2119. This is true here despite appellant's argument that his principle defense "was that Colon misidentified him as the man she saw struggling with Yesenia and that he was elsewhere at the time of her disappearance -- not that

he did the acts alleged but did them with innocent intent." See United States v. Lynn, 856 F.2d 430, 436 n.15 (1st Cir. 1988) ("This circuit has maintained that intent is in issue when it is an element of the crime charged, regardless of the defense presented.").

The evidence of appellant's intentional physical harm of the victim in the past had "special relevance," Aguilar-Aranceta, 58 F.3d at 798, because it was probative of his intent to cause her harm at the time he seized her car. As we note in discussing other issues in this case, appellant was seen inside the victim's car, striking her, immediately before her disappearance. Although this evidence alone might arguably suffice to establish the defendant's intent to cause the death of the victim at the time of the carjacking, we see no reason why the government should have been precluded from introducing some evidence of the defendant's prior abuse of the victim for the purpose of further illuminating his intent to cause her death or serious bodily harm at the time of the carjacking. Indeed, at closing argument, the defendant argued to the jury that the government had not proven the elements of the crime, including the intent element, and appellant now challenges on appeal the sufficiency of the evidence on the intent element specifically.

Furthermore, the evidence of appellant's stalking had special relevance because it demonstrated appellant's motive to

-14-

commit the crime -- his intense jealousy. Given appellant's claim that he was innocent of causing the victim's disappearance and death, the government was entitled to establish that motive to commit the crime. Evidence of appellant's stalking revealed that he was obsessed with the victim's whereabouts and activities. At one point, he placed a tape recorder in her car without her knowledge. Listening to her private conversations, he became convinced she was having an affair. According to the government's theory, the jealousy aroused by that knowledge led appellant to kill the victim. Indeed, he had previously stated to one of her friends that he was capable of killing her if he believed she were with another man.

Finally, the government used the evidence of stalking to argue that appellant was able to intercept the victim's car on a deserted road on April 15, 1999, because his constant surveillance allowed him to easily locate her. Therefore, the evidence of stalking also had the special relevance of demonstrating appellant's means to commit the crime.

Given the special relevance of appellant's physical abuse of the victim to his intent to cause her serious bodily harm or death at the time of the carjacking, and given the special relevance of the stalking to the appellant's motive and means to commit the crime, there was no error in the admission of the prior act evidence. Moreover, even if there was such an error, we must

remember that we are dealing here with a claim of plain error, which requires us to find both prejudice and serious impairment of "the fairness, integrity, or public reputation of the judicial proceedings" to warrant reversal. United States v. Ziskind, 491 F.3d 10, 14 (1st Cir. 2007). In that regard, we note all of the evidence relating to appellant's threats to do physical harm to the victim, which included: his statement to the victim's friend that he was capable of killing the victim if he believed she was with another man, his statement to the victim that "I am macho, and you have to respect me," made while choking the victim and overheard by her mother, and his statement to her mother that "I know what I will do before they disarm me," made upon learning about the protective order. In our view, those threats are not evidence of prior bad acts. They are more appropriately viewed as admissions by the defendant that he intended to do harm to the victim. In light of this evidence, we are confident that there was no plain error in the admission of evidence of prior abuse and stalking.

## III.

Having determined which of the challenged evidence may be considered in evaluating appellant's sufficiency of the evidence challenge, we now reach the merits of that challenge. In so doing, we will ignore the statements we have deemed to have been erroneously admitted.

Appellant claims that the district court erred in denying his Rule 29 motion for judgment of acquittal and claims that the evidence was insufficient to support his conviction. "[C]hallenges to the sufficiency of the evidence and to the denial of a the motion for judgment[] of acquittal raise a single issue," United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) (quotation marks and citation omitted), which we review de novo. United States v. Thompson, 449 F.3d 267, 275 (1st Cir. 2006). We inquire whether, taking the evidence in the light most favorable to the jury verdict, a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. Thompson, 449 F.3d at 275. In other words, this court "must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (quotation marks and citation omitted). A sufficiency claim therefore presents "daunting hurdles" for a defendant to overcome. Id. (quotation marks and citation omitted).

Appellant claims that his conviction must be overturned because the government failed to prove that he acted with intent to cause death or serious bodily harm to the victim at the moment of the carjacking. The carjacking statute under which he was convicted, 18 U.S.C. § 2119, reads:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the

person or presence of another by force and violence or by intimidation, or attempts to do so, shall . . . (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

We said in United States v. García-Álvarez, 541 F.3d 8, 16 (1st Cir. 2008), that "the element of intent must be established at the time the defendant takes control of the motor vehicle." The judge instructed the jury to apply the standard of García-Álvarez,[8] telling them to find appellant guilty only if the government met its burden to prove, inter alia, that "the defendant intended to cause the death of Yesenia when he took the motor vehicle." Given this instruction, the question for us is whether the evidence

---

[8] The court's instruction on the elements of the charged crime was:

Now in order for the defendant to be found guilty of that offense, which I just read to you, the government has to prove each of the following elements beyond a reasonable doubt:

First, that the defendant took a motor vehicle from the person of Yesenia. Second, that the defendant did so by force and violence. Third, that the motor vehicle previously had been transported, shipped, or received in interstate commerce. [Fourth,] [t]hat the defendant intended to cause the death of Yesenia when he took the motor vehicle. And last, that as a result -- that death resulted from the commission of the offense.

In closing argument, the government argued to the jury that it should find the defendant guilty if it found, inter alia, that "the defendant had the intent to murder Yesenia when he took the car."

-18-

permitted a reasonable jury to find the requisite intent beyond a reasonable doubt.

The evidence easily supports that conclusion. First, eyewitness Diana Colón-Laboy ("Colón") recounted seeing appellant sitting in the passenger seat of the victim's car shortly before her disappearance. The car was pulled to the side of the road and the passenger door was open. Colón observed appellant striking the victim, and heard the victim say "leave me alone." One of the passengers in Colón's car, Sidia Lebrón-Gonzales ("Lebrón") testified that she heard Colón identify the victim and appellant, both of whom Colón knew personally, as they drove by. This episode, in which appellant was seen inside the victim's car, striking her, was the last time the victim was seen. Hours later, her car was intentionally set ablaze in an abandoned field.

In addition to this eyewitness evidence, there was also the copious evidence of appellant's prior threats and physical assaults against the victim, from which a reasonable jury could conclude that appellant had the intent to seriously harm or kill Ortiz when he took control of her vehicle. For example, witnesses testified about appellant's claims that he was capable of killing Ortiz if he believed she was with another man, and the evidence showed that at the time of her disappearance he believed that she was dating another man. There was also evidence that appellant had choked the victim while yelling "I am macho, and you have to

respect me," and that he had once hit her so forcefully that she fell backward into a parked car. Furthermore, the victim's mother testified that appellant threatened that "he knew what he would do before they disarmed him" after the victim received the protective order. Finally, the evidence also showed that appellant stalked the victim up until the night of her disappearance and was obsessed with her location and activities. For example, after the couple's separation, appellant constantly phoned the victim's parents' home to ask where she was, often speaking in an angry and demanding manner. Appellant also followed the victim and her friends during their lunch hour, and, at one point, secretly placed a tape recorder under the seat of her car so that he could record her conversations.

And then there are appellant's damning admissions after the victim's disappearance that linked him to her murder. On April 21, 1999, appellant admitted to colleagues in the Puerto Rico police that he had been "upset and angry" with the victim and a man with whom he believed she was having an affair. On April 24th, appearing nervous and worried, he asked Sergeant Digno Cartagena-Colón what would happen if the victim were found wearing his sweater. On June 16th, when Sergeant Daniel Colón-Díaz, a longtime friend and colleague of appellant's father, told appellant that there was enough evidence to file charges against him and also against his younger brother, appellant responded that he had acted

alone and that his brother had not been involved. When Colón-Díaz promised not to involve the press if appellant would tell the police what had happened to the victim and take them to her body, appellant responded by promising to tell him "everything related to Yesenia's case" the next day. After that conversation, former Puerto Rico Police Commander Jovito Miró-Alvarado also spoke with appellant and encouraged him to confess immediately. Appellant refused, saying that he wanted his family to learn what had happened first because he lived in a small town and it would create a scandal, but promised to take them to the body after speaking to his family. When Miró asked appellant whether he was sorry "for what he had done to Yesenia," appellant responded that he was sorry. Miró then told appellant that there was a helicopter waiting to take them to the body, but appellant responded that a helicopter would not be necessary to reach it.[9]

From this evidence, a reasonable jury could conclude that appellant had the intent to kill or seriously harm the victim when he took control of her car on the night of April 15, 1999. We therefore reject his challenges to the district court's denial of his Rule 29 motion for acquittal and to the sufficiency of the evidence proving that he had the requisite intent to commit a carjacking.

---

[9] After this conversation, appellant spoke to his father and aunt alone. Appellant's aunt called a lawyer, who also arrived and spoke with appellant. After speaking with his family and his lawyer, appellant made no more incriminating statements.

-21-

We now address various challenges brought by appellant that would, if successful, result in a new trial.

## A. Restrictions on Impeachment

Appellant argues that the district court erred by restricting the introduction of evidence that he claims would have impeached the victim's statements about his stalking and abuse.

1. The Recorded Conversations

Appellant argues that the district court erred in excluding from evidence tape recordings of the victim talking to passengers in her vehicle and on her cellular telephone while she was driving. The recordings were made by appellant months before her disappearance, by surreptitiously placing a tape recorder under the driver's seat of the victim's car. During direct examination of appellant, his counsel sought to play the recordings to the jury for the purpose of impeaching the hearsay statements of the victim, entered through government witnesses, that described appellant's abuse. This is the hearsay testimony that the government has acknowledged was wrongly admitted.

When a hearsay statement has been admitted under Rule 802, Rule 806 allows a party to attack the credibility of the hearsay statement "by any evidence which would be admissible for those purposes if [the] declarant had testified as a witness." Fed. R. Evid. 806. Appellant theorizes that the tapes impeached

the victim's accusations of abuse not because of what she actually said on the tapes, but because of how she said it. According to him, her tone and attitude as reflected on the tapes "corroborated the fact that she was having an affair and was not, in fact, afraid of Berríos."[10] At trial, counsel for appellant argued:

> Yesenia in those tapes is very calm. She's very cool. She is joking, she is laughing. She says that, well, he might kill me; go ahead. She doesn't sound afraid at all. She never says that I have been hit, abused. In fact, it says that when that mother fucker, if he knew . . . who the ties were for,[11] he would kill me -- but she's laughing.

The district court prohibited appellant from entering the tapes, but based its rejection of the evidence on a misreading of the Rules of Evidence. The court first ruled that the tapes could not be used under Rule 806 to impeach the victim's allegations because she was not a "declarant," stating that "[t]he definition of declarant under the rules of evidence specifically 801, is a person who takes the witness stand." In fact, the Rules of Evidence define "declarant" as "a person who makes a statement." Fed. R. Evid. 801(b). The court later stated that the evidence was inadmissible to impeach the victim under Rule 806 because the

---

[10] We fail to see how the victim's alleged "affair" during this time would impeach her statements about appellant's abuse.

[11] Evidence at trial showed that appellant searched Ortiz's car while it was parked at her office in February 1999 and was upset to find men's ties, which he believed were a gift for another man.

-23-

statements appellant sought to impeach were not hearsay but rather "exceptions to hearsay."  This was also mistaken; the admitted statements were hearsay even if, as the court ruled, the statements were excepted under Rule 803 from Rule 802's prohibition against hearsay.  They thus were appropriate subjects for impeachment under Rule 806.

However, despite the mistaken logic for excluding the tapes, there was no error in their exclusion, and we are "'not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record.'" United States v. Shinderman, 515 F.3d 5, 12 (1st Cir. 2008) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003)).  Here, the tapes were inadmissible as impeachment evidence because their contents did not contradict the statements appellant sought to impeach.  See United States v. Hale, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.  As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent."); United States v. Zaccaria, 240 F.3d 75, 79 (1st Cir. 2001); see also United States v. Finley, 934 F.2d 837, 839 (7th Cir. 1991) ("Rule 806 extends the privilege of impeaching the declarant of a hearsay statement but does not obliterate the rules of evidence that govern how impeachment is to proceed.").

The tapes, which were transcribed by the FBI shortly before trial, recorded the victim discussing appellant's abuse and stalking. For example, she discussed on the tapes how appellant had searched her car at least two times while it was parked and how he often followed her car. The following exchange between the victim and her sister Yessica, who was riding in the victim's car, was recorded on the tapes:

> Yesenia Ortiz-Acosta (YOA): Everybody feels sorry for Sammy, but nobody feels sorry for me . . . what bothers me the most is that he wants to appear as the victim.
>
> Jessica Ortiz-Acosta (JOA): But, Yesenia, what I'm saying is . . . What we are afraid of, too is that he'll try to do something to you.
>
> YOA: Well, Jessica, let him do it. Let him do it.
>
> JOA: Or the baby girl.
>
> YOA: He's not going to do anything to the baby girl.
>
> JOA: Yes, but, to you?
>
> YOA: And, let him do it. What am I going to do?
>
> JOA: And if he kills you or something?
>
> YOA: Let him kill me. . . .
>
> JOA: But do you think he is capable of that?
>
> YOA: Oh, Jessica . . . Well, I don't know Jessica, I don't know.

This is just one of the interchanges caught on tape that corroborate the government's case against appellant. Far from impeaching the victim's alleged statements of abuse, the tapes tell

the story of a young woman plagued by a possessive, stalking husband. Although we have only read the transcripts of the tapes and acknowledge that appellant's argument relies on the declarant's tone of voice, appellant cannot avoid the fact that the contents of the tapes, rather than contradicting Ortiz's allegations of abuse, strongly corroborate those allegations. Rather than proving, as appellant asserts, that the victim "was not, in fact, afraid of Berríos," the tapes record the victim stating that "deep inside, I am a little scared of [Berríos]." In sum, we agree with the government that "Ortiz-Acosta's hearsay statements indicated that Rodríguez-Berríos had abused and stalked her; Ortiz-Acosta said nothing on the tapes even suggesting that Rodríguez-Berríos did not do so." Because the recordings do not contradict the victim's hearsay allegations of abuse, there was no error in the district court's exclusion of the tapes.[12]

### 2. Ortiz's Relationship with a District Attorney

Appellant also argues that the district court abused its discretion in sustaining government objections to questions asked on cross-examination of the victim's mother and her co-worker about

---

[12] The government argues that there are other reasons for excluding the tapes, citing the rule against impeachment on a collateral matter through extrinsic evidence and, in light of the fact that there is no question that the recordings were made illegally, the federal statute prohibiting use of illegally made recordings in legal proceedings. See 18 U.S.C. §§ 2511, 2515. Because we have determined that the tapes did not contain prior inconsistent statements, however, we need not address these alternative grounds for exclusion.

the victim's alleged affair with a district attorney. Appellant argues that he should have been allowed to introduce evidence that "Yesenia's affair was with Serrano in particular to impeach the inference sought by the government from the fact that a domestic violence complaint had been filed against him, i.e., to infer that the complaint was only filed because of Serrano's influence in the District Attorney's Office." This inference is so insubstantial that the district court was well justified in excluding the evidence. Moreover, appellant's desired in-depth inquiry into the victim's alleged affair with a district attorney would not meet the strictures of Rule 403 because of its high potential for prejudice compared to its low probative value. We therefore find no abuse of discretion in the district court's refusal to allow this inquiry, which could reasonably be seen as merely an attempt to impugn the character of the victim.

## B. Exclusion of an Expert Witness on Eyewitness Identification

Appellant argues that the district court erred in refusing to allow him to present testimony from an expert witness regarding the reliability of eyewitness identification. We review a decision to exclude expert testimony for abuse of discretion, United States v. Diaz, 300 F.3d 66, 74 (1st Cir. 2002); we are deferential toward a district court's decision, United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000).

Appellant sought to introduce expert testimony on the factors influencing the perception and memory of the government's eyewitnesses, Colón and Lebrón. Colón testified that she had seen appellant sitting in the victim's car, striking the victim, shortly before the victim's disappearance. At around 7:45 p.m. on April 15, 1999, Colón was driving with two friends from Guayama's town center toward a restaurant in Guayama's Branderi Ward. As she approached Branderi, Colón was forced to stop her car because two vehicles blocked the road. On the right side of the road, blocking her way, was a green Hyundai, similar to appellant's car, and on the left was a champagne-colored Toyota, similar to the victim's car. Colón flashed her high beams and the green Hyundai sped away. Colón then moved forward slowly. As she passed the champagne Toyota, she saw that its passenger door was open and the interior light was on. She saw the victim sitting in the driver's seat of the vehicle and appellant in the passenger seat. Colón knew the victim because her husband worked with the victim's father, Ánibal Ortiz-Rodríguez, and she knew appellant because of his marriage to the victim. As they passed the car, Lebrón, who was a passenger in the car, heard Colón say, "Those are Ánibal's daughter and son-in-law." Colón testified that as she drove by the Toyota she heard the victim say, "leave me alone, leave me alone," and saw appellant striking her. As Colón continued to pass the car, appellant stopped hitting the victim and made eye contact with her. Colón

testified that she did not stop driving because it was dark. As they approached the restaurant and the area grew lighter and more populated, one of Colón's passengers called 911. Apparently, the passenger got a busy signal and did not retry.[13]

In a pretrial motion, appellant sought the court's permission to retain Dr. Geoffrey R. Loftus, a professor of psychology and a specialist in perception and memory, as an expert witness.[14] Appellant proffered that Dr. Loftus would testify about the factors influencing Colón and Lebrón's perceptions and memories of the night of April 15, 1999. In a written opinion, the district court denied the motion to retain Dr. Loftus and ruled his testimony inadmissible. United States v. Rodríguez-Berríos, 445 F.Supp.2d 190 (D.P.R. 2006).

Although appellant urges us to adopt a rule that would categorically allow expert testimony on the flaws inherent in eyewitness identification,[15] we have consistently maintained that

---

[13] Lebrón gave testimony about the incident that was consistent with Colón's testimony. However, although she saw a man and woman in the car and heard "loud voices," she said did not hear what they were saying or see what was happening in the car.

[14] Appellant was represented by court-appointed counsel pursuant to the Criminal Justice Act. See 18 U.S.C. § 3006A. The request was for the court to pay for the services of the expert witness, also pursuant to that act. 18 U.S.C. § 3006A(e).

[15] Appellant cites an increasing body of academic literature concerning the reliability of eyewitness testimony. See, e.g., Richard A. Wise, Kirsten A. Dauphinais & Martin A. Safer, A Tripartite Solution to Eyewitness Error, 97 J. Crim. L. & Criminology 807 (2007); Jennifer L. Devenport, Steven D. Penrod & Brian L. Cutler, Eyewitness Identification Evidence, 3 Psychol.

the admission of such testimony is a matter of case-by-case discretion and have refused to adopt such a blanket rule for its admission or exclusion. United States v. Stokes, 388 F.3d 21, 27 (1st Cir. 2004), vacated on other grounds 544 U.S. 917 (2005) (summarily vacating in light of United States v. Booker, 543 U.S. 220 (2005)); United States v. Brien, 59 F.3d 274, 277 (1st Cir. 1995). We adhere to that position. While such testimony will sometimes comply with the strictures of Federal Rule of Evidence 702 (the rule that governs expert testimony) because it "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, other times it will not. See Brien, 59 F.3d at 276-77. In order to assist district courts faced with deciding whether to admit such expert testimony, we have suggested factors that influence its usefulness under Rule 702, such as "the reliability and helpfulness of the proposed expert testimony, the importance and the quality of the eyewitness evidence it addresses, and any threat of confusion, misleading of the jury, or unnecessary delay." Id. at 277.

The district court in this case carefully considered the factors that we have set forth as relevant to the issue of whether to admit expert witnesses on eyewitness identification. Rodríguez-Berríos, 445 F.Supp.2d at 192-95. It first examined the importance of the  eyewitness evidence that Dr. Loftus sought to address. Id.

_____

Pub. Pol'y, & Law 338, 338 (1997).

at 193. While it acknowledged that the eyewitness account was an important part of the government's case, the government did not rely solely on that testimony. Other important evidence included the defendant's incriminating statements before and after the disappearance, and the evidence of his stalking, threats, and physical abuse of the victim.

Quoting the Advisory Committee note accompanying Rule 702, the district court noted that:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having specialized understanding of the subject involved in the dispute.

Id. at 192 (quoting Fed. R. Evid. 702 advisory committee's notes). The district court explained that Dr. Loftus had identified three perception-memory issues relevant to the case: 1) the accuracy of Colón's original perception of the two people in the vehicle, 2) the accuracy of Colón's memory of having verbally identified the vehicle's occupants, and 3) the accuracy of Lebrón's memory that Colón identified the individuals in the car. Id. at 193. According to the proffered report, Dr. Loftus would analyze these three issues in relation to factors such as "general lighting conditions, the consequences of illumination from a car's interior light, the eyewitness' possible lack of attention, and post-event

-31-

information," and testify that any confidence displayed by Colón and Lebrón "should not, contrary to common sense, be construed as a reflection of the accuracy of their memories." Id. (quoting report of Dr. Loftus).

The district court observed that these factors -- lighting, lack of attention, and post-event information -- are particularly susceptible to exposure through cross-examination without the benefit of expert testimony. It therefore found that an expert witness on eyewitness testimony would be less helpful in this case, unlike a situation in which "an identification was made after a long delay or under conditions of extreme stress," id. at 194 (citing United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993)), or when the witness's faculties were impaired at the time of the event, id. (citing State v. Whaley, 406 S.E.2d 369 (S.C. 1991)). The court concluded that Dr. Loftus's testimony was not relevant "'in the incremental sense that . . . , if admitted, [it] likely would assist the trier of fact to understand or determine a fact in issue.'" Id. (quoting Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998)). Instead, "Dr. Loftus' testimony in this case would involve little more than 'a credibility determination within the ken of the ordinary judge and juror -- unlike, say, DNA identification.'" Id. (quoting Brien, 59 F.3d at 276).

Finally, the district court concluded that Dr. Loftus's proffered testimony had the potential to be seriously misleading in light of jurors' possible tendency to give undue weight to expert testimony. The court wrote:

> While often invaluable to the search for truth, these experts' testimony carr[ies] a great deal of inherent reliability, which jurors can often confuse for infallibility. In cases such as this one, where vigorous and competent cross-examination can adequately flesh out the possible effect of factors such as lighting, lack of attention, and post-event information on the eyewitness[es'] identifications without exposing the jury to this type of prejudice, expert testimony can, and should, be excluded.

Id. at 194. After this careful assessment of the relevant considerations, the district court concluded that the proffered expert testimony should be excluded. This ruling was not an abuse of discretion.[16]

## C. Denial of Appellant's Motion for a Mistrial

Appellant argues that he should have been granted a mistrial after a government witness inappropriately testified that appellant had been summoned to San Juan to take a polygraph test during the course of the investigation into the victim's

---

[16] Although appellant also alludes to an argument that the district court's ruling on Dr. Loftus violated his Sixth Amendment right to present a defense, he does not develop any argument that is distinct from his argument that the district court abused its discretion in refusing to authorize funds for the retention of an expert witness. Therefore, our abuse of discretion analysis resolves this undeveloped claim as well.

disappearance. Defense counsel immediately objected to the testimony, requested a sidebar, and moved for a mistrial. The district court denied the motion for a mistrial. After sidebar, however, in the presence of the jury, the court granted appellant's request to strike the witness's reference to the polygraph test and admonished the witness, saying:

> [Y]ou are to testify only what you're asked. I believe you had received some instructions from the assistant U.S. Attorney that you were not to go into certain matters -- and you were about to go into those -- and not to volunteer any information. If you do, I'm going to strike your whole testimony.

Also in the presence of the jury, the court admonished the government by stating, "I'm going to allow you again to talk to the witness, advise him properly as to what are the areas that you are asking him. If he volunteers any information, the government is going to be in trouble."

After these warnings, the court adjourned for the evening. In the morning it offered a curative instruction to the jury, reiterating its instruction at the beginning of the trial that the jurors were to disregard any testimony which had been ordered stricken. It then continued:

> You should totally disregard the testimony provided yesterday . . . about a polygraph test allegedly offered to the defendant . . . . This means that you cannot consider it in any way or fashion during your deliberations in this case . . .

To be sure, it is troubling that a polygraph test was mentioned in the presence of the jury. The defendant's concern about the potentially prejudicial effect of the mention of the polygraph is understandable. Polygraph results are rarely admissible at trial. See, e.g., deVries v. St. Paul Fire and Marine Ins. Co., 716 F.2d 939, 944-45 (1st Cir. 1983) (reserving the question "whether a per se prohibition against the use of lie detector tests is appropriate," but noting that "polygraph evidence has long been considered of dubious scientific value and hence has been deemed irrelevant by the federal courts.") (quotation marks and citation omitted); see also United States v. Johnson, 446 F.3d 272, 278 (2nd Cir. 2006); United States v. Dotson, 324 F.3d 256, 261 (4th Cir. 2003).

Nonetheless, we disagree that the brief mention of the possibility of a polygraph examination warranted a mistrial. First, although the government witness mentioned that the defendant was "summoned" to take a polygraph examination, he did not say whether appellant actually took the test or describe its results. Furthermore, the witness was immediately reprimanded in front of the jury and the testimony stricken. The next day, the jurors were given a lengthy curative instruction that reminded them of their duty to follow the judge's instructions to disregard the testimony. "Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper

testimony," and "appellate courts inquiring into the effectiveness of a trial judge's curative instructions should start with a presumption that jurors will follow a direct instruction to disregard matters improvidently brought before them."  United States v. Sepulveda, 15 F.3d 1161, 1185 (1st. Cir 1993).

Given all of these considerations, we find no abuse of discretion in the district court's refusal to grant appellant's motion for a mistrial.

## D. Harmlessness of Other Evidentiary Errors

As discussed earlier, we have concluded that the district court erroneously admitted certain statements entered through the testimony of the victim's friend, Ramos, and her mother, Acosta. Specifically, we concluded that the following statements were inadmissible: the victim's identification of her bruises as having been caused by appellant; her statement that she was afraid of appellant; her statement that appellant was an "abuser"; her statement that appellant would throw their baby at her; and her statement that she could not "have lunch in peace."  Because these statements should not have been admitted, we did not consider them as part of the body of evidence supporting appellant's conviction. Nevertheless, we must now consider whether the erroneous admission of the statements was harmless.  If not -- i.e., if appellant was

prejudiced by the errors -- appellant must be granted a new trial.[17]

"'The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of the trial.'" United States v. Dunbar, 553 F.3d 48, 59 (1st Cir. 2009) (quoting United States v. Tom, 330 F.3d 83, 95 (1st Cir. 2003)). This inquiry is case-specific and includes "consideration of such factors as the 'centrality of the tainted evidence, its uniqueness, its prejudicial impact, the use to which evidence was put, and the relative strengths of the parties' cases.'" United States v. Isler, 429 F.3d 19, 26 (1st Cir. 2005) (quoting United States v. Garcia-Morales, 382 F.3d 12, 17 (1st Cir. 2004)).

The erroneously-admitted accusations were repetitious of other evidence of appellant's stalking, violent threats, and violence, and were, therefore, neither "unique" nor "central[]" to the government's proof of appellant's stalking and abuse. This other evidence included Acosta's eyewitness account of an incident in which appellant choked the victim in the hallway of her home while saying "I am macho, and you have to respect me," as well as testimony from appellant's former neighbor that months before the

---

[17] The government accurately points out that appellant failed to object at trial to some of this evidence, such as the victim's statement that appellant was an "abuser" and sometimes threw their baby at her. While we normally review unpreserved objections under the plain error standard, United States v. Matos-Quiñones, 456 F.3d 14, 20-21 (1st Cir. 2006), for simplicity we will review all of the evidentiary errors under the more stringent (from the perspective of the government) harmless error standard. In this case, the outcome is the same.

separation she saw appellant hit the victim so hard that the victim fell backwards into a parked car. Furthermore, evidence of appellant's stalking came in through the testimony of the victim's friends who regularly ate lunch with her and observed that appellant constantly monitored her, even up to the day of her disappearance, when he appeared during their lunch hour. There was also evidence that appellant would constantly telephone the victim's parents after the separation and inquire in a menacing manner about the victim's whereabouts; his admissions on these phone calls revealed he was tracking the victim closely. One time, he told the victim's mother, "I'm going to give her a little time for her to return back with me. And if she doesn't come back with me, I know what I'm going to do."

Finally, the government's case included the admissions made by appellant in the months following the victim's disappearance, and the eyewitness testimony placing him in the victim's car, abusing her, moments before her disappearance. In light of their lack of centrality to the government's case, their redundancy, and the relative strength of the government's case against appellant, we find that the erroneously-admitted statements were harmless.[18]

**Affirmed**.

---

[18] Appellant refers briefly, without any development, to a cumulative error argument. We deem this perfunctory argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).